UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WAYMAN C. DISMUKES, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:04-0170 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| COMMISSIONER, TENNESSEE ) | |
| DEPARTMENT OF CHILDREN'S ) | |
| SERVICES, in her official capacity, ) | |
| and FRANK H. MIX, in his official ) | |
| capacity, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

This matter comes before the court on a Motion for Summary Judgment filed by the defendants (Docket No. 41), to which the plaintiff has responded (Docket No. 48) and the defendant has replied (Docket No. 53). For the reasons discussed herein, the defendants' motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Wayman Dismukes was employed by the Tennessee Department of Children's Services as a Case Manager from August 19, 1999 to October 31, 2003.[1] A Case Manager oversees children who, for one reason or another, have come under the purview of the

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1, attach. Compl.), the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 54), plaintiff's Affidavit (Docket No. 50), and the plaintiff's Response in Opposition to Motion for Summary Judgment (Docket No. 48).

1

Department of Children's Services. Often the children have been placed in shelters. Dismukes was to ensure that those children were placed with families and were provided with education and healthcare. Dismukes's specific responsibilities included visiting the children at their homes, making court appearances on behalf of the children, and drafting plans. Dismukes was also required to update certain files for his social services cases. Dismukes claims to have been sexually harassed by a female employee and to have been subsequently harassed and terminated from his job in retaliation for reporting the original harassment. In addition, Dismukes claims to have been terminated in retaliation for reporting Defendant Frank Mix's violation of Tennessee law in failing to pay his overtime wages.

Dismukes's work-related issues date back to April 10, 2000, when Juanita Jackson, his supervisor, received a letter of complaint from a therapist who was treating a child under Dismukes's professional supervision. (Docket No. 42 Ex. A.) The letter states that Dismukes had made scheduling errors, had not shown up to a meeting with the therapist, the child's father and an attorney, and was in general "rude and rather unconcerned about the needs of the clients and their families." (*Id*.) Later that year, on June 16, 2000, Jackson held a meeting with Dismukes in which several performance issues were discussed. (Docket No. 42 Ex. B.) At that meeting, Jackson told Dismukes that he was unable to juggle multiple tasks, and as a result, children were spending longer in shelters than was necessary. (*Id*.) The defendants have provided extensive documentation of other problems with Dismukes's job performance in 2000, including Dismukes's failure to provide dental care for his clients and failure to meet deadlines. (Docket No. 42 Ex. D, E, F.) Despite these issues, Dismukes scored a three, or "good" overall, on his formal evaluation from 2000. (Docket No. 42 Ex. C.) That evaluation does, however,

show scores of two, or "marginal," in several performance areas. (*Id.*)

During the month of March 2001, Dismukes told Juanita Jackson that he was being sexually harassed by Margaret Amditis, another Case Manager at the Gallatin facility.[2] Jackson told him that Amditis was a good worker and that Jackson did not want to harm her. Presumably dissatisfied with Jackson's response, Dismukes next reported Amditis' behavior to Jackson's supervisor, Frank Mix. Dismukes alleges that neither Jackson nor Mix took any action to investigate his claims. Instead, Jackson criticized Dismukes in various ways and ridiculed him in front of his coworkers. Dismukes alleges that Jackson knocked papers from his desk, screamed at him, and disallowed him from taking a lunch break.

Meanwhile, Dismukes's performance issues continued. For instance, in March 2001, Dismukes was issued a memo from Frank Mix highlighting his failure to follow Department procedures and to meet deadlines. (Docket No. 42 Ex. H.) However, evaluations from this period indicate that Dismukes was making some progress at work. (Docket No. 42 Ex. I.) In July of that year, Dismukes received a formal evaluation from Juanita Jackson in which many of his "marginal" scores had risen to "good" or "exceptional," and in fact, no individual score went

---

[2]In his Complaint, Dismukes states that he reported the harassment in March 2002 (Docket No. 1 at ¶ 17), while in his Affidavit, Dismukes states, "it was June 2002, that I reported experiencing sexual harassment from a female employee." (Docket No. 50 at 31.) Finally, in his Reply Brief, Dismukes first states that he reported the harassment in March 2001—a full year earlier than his original time-frame—and then states that he reported sexual harassment "from a female employee" in June 2002. (Docket No. 48 at 3, 5.) It is unclear from the record whether these statements relate to the same incident or to different incidents. Documentation provided by the defendants indicates that Dismukes first complained about Amditis's harassment on March 6, 2001. (Docket No. 43, Ex. J.) There is no subsequent documentation of any complaints made by Dismukes about Amditis' conduct. Dismukes did file a grievance against Juanita Jackson on March 22, 2002, but it is unclear what Dismukes alleges to have happened in June of that year. The record does show that on June 11, 2002, Frank Mix issued Dismukes an official written warning. (Docket No. 43, Ex. P.)

3

below the level of "good." (Docket No. 42 Ex. K.) Despite the improvement in these areas, Dismukes' overall score was still set at three, or "good." (*Id*.)

Dismukes' relationship with his supervisors seems to have taken a turn for the worse a few months after that evaluation. On December 30, 2001, Juanita Jackson issued Dismukes an oral warning for ignoring directions from his superiors. (Docket No. 42 Ex. L.) A supervisor had told Dismukes not to take a new co-worker to an out-of-office meeting. Dismukes had told the co-worker to join him anyway—and she had in fact joined him, though she provided her own transportation. Along with the oral warning, Jackson issued Dismukes a memorandum stating, "If any additional such actions should occur, you may receive additional disciplinary action, up to and including termination." (*Id*.)

The situation continued to deteriorate in 2002. Frank Mix received a letter in January of that year from a children's shelter. The letter stated that Dismukes had failed to transport a child from the shelter to several different court appearances, attaching a hand-written statement from the child in question. (Docket No. 42 Ex. M.) In March 2002, a year after reporting to Juanita Jackson that he was being sexually harassed by a co-worker, Dismukes filed a grievance with the Tennessee State Employees Association ("TSEA") alleging that Jackson had discriminated against him and harassed him sexually. Disumkes also notified the defendant Commissioner of his charges. It is unclear from the Complaint on what basis Jackson was alleged to have discriminated against Dismukes. Nevertheless, after he submitted the complaint to the TSEA, Dismukes alleges that Frank Mix began to treat him harshly. On April 30, 2002, Dismukes met with Mix and the Regional Administrator for the Department of Children's Services, a Mrs. Kasch, to discuss the grievance. Kasch and Mix determined that Dismukes should no longer be

4

supervised by Juanita Jackson, and instead, Dismukes was placed under the supervision of Frank Mix himself. Dismukes alleges that Mix continued to treat him poorly, "yelling at [him] and threatening [his] job . . . and giving [him] severe disciplinary action." (Docket No. 50 at ¶ 30.)

A year passed, during which the defendants documented a host of performance deficiencies, including Dismukes's negligence in the performance of his activities and his refusal to accept assignments from an authority figure. (Docket No. 43 Ex. S.) On May 13, 2003, the Department of Children's Services conducted a due process hearing pertaining to Dismukes's job performance. The hearing concerned new allegations that Dismukes had disobeyed instructions from his superiors not to perform certain overtime work and had not adequately updated his files. (Docket No. 43 Ex. U.) Dismukes was suspended without pay for two days for violating several Department of Personnel Rules, including insubordination. (*Id*.) Dismukes appealed the decision and participated, along with Frank Mix, in a grievance hearing. The suspensions were not overturned. On May 28, 2002, Juanita Jackson issued Dismukes a largely negative Interim Evaluation, in which she reiterated Dismukes's problems in scheduling events, completing reports, and working efficiently. (Docket No. 43 Ex. O.) Jackson mentioned that Dismukes enjoyed socializing during work hours and could often be found in the break room when his deadlines were near. (*Id*.) Dismukes disagreed with the evaluation so vehemently that he wrote directly on it, stating that he had "Always provided Excellent Case Management Services to my client And to the Department of Children's Services." (*Id*.)

Dismukes alleges that, "in May or June" 2003, he made a formal complaint to the Department of Labor against defendant Mix for refusing to pay his overtime wages. Dismukes

5

alleges that he was successful in obtaining his lost overtime.[3] On July 11, 2003, Frank Mix recommended that the Department of Children's Services terminate Dismukes's employment for continued violations of Department policies. The Commissioner agreed, firing Dismukes on July 21, 2003.

On March 2, 2004, Dismukes filed this action in the Middle District of Tennessee, having first received a right-to-sue letter from the United States Equal Employment Opportunity Commission ("EEOC"). Dismukes alleged (1) unlawful retaliation in violation of Title VII and the Tennessee Human Rights Act ("THRA") and (2) retaliation in violation of Tennessee public policy, as expressed in the Tennessee Public Protection Act. The defendants moved for summary judgment on November 30, 2005. (*See* Docket No. 41.) In its response brief, Dismukes alleged a somewhat different set of claims: (1) unlawful retaliation in violation of Title VII and (2) common law retaliatory discharge under Tennessee law.

## ANALYSIS

### I.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the

---

[3]In addition, the Complaint alleges that in July 2003, Dismukes told an official about a separate type of misconduct on the part of Frank Mix. According to the Complaint, Mix lied about the responsibilities of another case manager or permitted that case manager to lie. Dismukes alleged that a fellow case manager had claimed to represent more clients than she actually represented and that the misstatement amounted to a federal or state law violation. Dismukes did not discuss this claim in his Response and, instead, set forth a new set of claims under Tennessee common law. (Docket No. 48 at 1, 6.) Nevertheless, it is analyzed below.

6

moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*,

7

477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II. Unlawful Retaliation In Violation Of Title VII

The plaintiff asserts that he was retaliated against in violation of Title VII for reporting an act of sexual harassment to his supervisor. Title VII cases follow the burden-shifting structure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After the plaintiff demonstrates a *prima facie* case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant is able to make that showing, the burden shifts back to the plaintiff to demonstrate that the reason offered by the defendant was not its true motivation, but rather, a pretext for discrimination. *Id.*; *see also Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004); *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). Because the plaintiff does not set forth an adequate *prima facie* case, the remaining stages of the analysis are unnecessary.

### A. *Prima Facie* Case

To establish a *prima facie* case for a retaliation claim, the plaintiff must show the following: (1) that he engaged in activity protected by Title VII, (2) that the defendants knew he engaged in protected activity, (3) that he suffered an adverse employment decision, and (4) that a causal connection exists between the protected activity and the adverse action taken against the plaintiff. *Siegfield*, 389 F.3d at 565, *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). Alternatively, Dismukes can establish a *prima facie* case by proving that he was "subjected to

8

severe or pervasive retaliatory harassment by a supervisor" and that there was a causal connection between the protected activity and the harassment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). The parties do not dispute that the plaintiff engaged in protected activity, that the defendants knew about the activity, or that the plaintiff suffered an adverse employment decision. However, it is necessary to briefly discuss those elements as they relate to the fourth showing, causation, which is very much at issue.

The parties agree that Dismukes engaged in protected activity when he told his supervisor, Juanita Jackson, that he was being sexually harassed at the office by Margaret Amditis. Although Dismukes stated in his Complaint that he reported the harassment in March 2002, he has since claimed that he reported this harassment in March 2001. (Docket No. 48 at 4.) Written documentation provided by the defendants corroborate that he did report Amditis' behavior in March 2001. (Docket No. 43, Ex. J.) Dismukes' confusion on this issue may arise from the fact that he took similar action in March 2002, when he reported his supervisor, Juanita Jackson, for sexual harassment to the TSEA and to the Commissioner of the DCS. (Docket No. 43, Ex. N.)

Additionally, Dismukes alleges that he "reported experiencing sexual harassment from a female employee" in June 2002. (Docket 48 at 5.) It is unclear whether the harasser in this June episode was Jackson, Amditis, or somebody else, nor is it clear to whom Dismukes reported this harassment. If Dismukes took additional protected action in June 2002, he has not pled sufficient facts to demonstrate it. *Williams v. Ford Motor Co.*, 187 F.3d at 537-38. Therefore, the analysis will proceed on the premise that Dismukes engaged in protected activity once in March 2001 and again in March 2002. *See EEOC v. Ohio Edison Co.*, 7 F.3d 541, 545-46 (6th

9

Cir. 1993).

The parties also agree that the defendants knew about the complaints Dismukes made in March 2001 and March 2002. Dismukes suffered an adverse employment decision when he was fired on July 21, 2003. In order to complete his *prima facie* case, Dismukes must show either that he was fired in July 2003 in retaliation for the two protected activities—which took place over one and two years earlier—or that he was subjected to severe or pervasive harassment by a supervisor in retaliation for either of those activities. Dismukes has made neither showing.

### 1. Causation For The Adverse Employment Action.

In order to demonstrate causation, Dismukes must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not engaged in the protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Some Sixth Circuit opinions have indicated that close temporal proximity between the two events is sufficient to demonstrate a causal connection for purposes of the *prima facie* case. *See, e.g., DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir. 2004); *Siegfield*, 389 F.3d at 563. However, in each of those cases, the adverse employment action occurred only several months after the plaintiff undertook a protected activity. The Sixth Circuit has adhered to the rule that an interval of more than six months between the adverse action and the protected activity will not, by itself, establish a causal connection. *Lentz v. City of Cleveland*, 410 F. Supp. 2d 673, 691 (N.D. Ohio 2006) ("anything over six months is generally insufficient, standing alone, to establish a causal connection") (citing *Sanchez v. Caldera*, 36 Fed. Appx. 848, 846 (6th Cir. 2002). Because Dismukes's protected activity occurred at least a year before he was fired, he cannot demonstrate a causal connection by temporal proximity.

10

Neither can Dismukes demonstrate a causal connection in any other way. Although Dismukes's burden to establish a *prima facie* case is "not onerous," he is required "to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal citations omitted). Dismukes has provided the court with positive case-file audits from his relevant employment period and has offered evidence that he was wrongly denied overtime pay in 2003. However, evidence that Dismukes was doing some things at work correctly and evidence that he was vindicated in a dispute involving his overtime pay do little to demonstrate that Dismukes was fired specifically because he reported sexual harassment. Otherwise, Dismukes relies on his own oral assertions. For instance, Dismukes asserts that Margaret Amditis was a favorite employee of Juanita Jackson's. However, it was Frank Mix, not Juanita Jackson, who recommended to the Commissioner that Dismukes be terminated. Dismukes does not allege that Amditis was a particular favorite of Mix's. Nor does Dismukes provide evidence that his subsequent claims against Jackson caused the Department to fire him. Because Dismuke's only relevant submissions to the court on this subject are his own assertions, he has not shown causation between his firing and the protected activity. *See, e.g., Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987) (holding that the plaintiff's own assertions, by themselves, were insufficient to demonstrate a causal connection).

### 2. Severe Or Pervasive Harassment By A Supervisor

Dismukes may also establish a *prima facie* case by showing that his protected activity caused him to be severely or pervasively harassed by a supervisor at work. *Morris v. Oldham*

11

*County Fiscal Court*, 201 F.3d at 792. He has not done so. The evidence suggests that Dismukes was engaged in a long-term conflict with his supervisors at work; it does not suggest, however, that he was being harassed.

The Sixth Circuit has held that "the standard for severe or pervasive harassment is the same in the retaliation context as in the sexual and racial discrimination contexts." *Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) (internal citations omitted). That standard requires that "the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). The test has both an objective and subjective element: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive." *Akers*, 338 F.3d at 498 (internal citations omitted).

*Akers* is particularly instructive. In that case, the plaintiff alleged she was harassed at work in retaliation for making a sexual harassment complaint. *Id*. at 499. After making the original complaint, the plaintiff was removed from the supervision of the alleged harassing supervisor. Subsequently, that supervisor ignored the plaintiff, teased her, encouraged her coworkers to do the same, criticized her work, and withheld her mail. *Id*. Although the conduct giving rise to the plaintiff's original complaint was particularly egregious (and likewise more offensive than anything raised by Dismukes in this case), the Sixth Circuit held that, because the plaintiff was removed from the purview of the offending supervisor shortly after raising the issue, and because the alleged post-complaint conduct fell short of the egregious conduct required by Sixth Circuit precedent, the plaintiff could not make out a *prima facie* case for

12

retaliation. *Id*.

In *Akers*, the Sixth Circuit distinguished *Morris*, 201 F.3d at 792, in which the Court first recognized the action of retaliatory harassment under Title VII. In *Morris*, the offending supervisor called the plaintiff over thirty times for the sole purpose of harassing her, stared at her through her window from outside, and threw nails onto her home driveway on more than one occasion. *Id*. at 793. The Sixth Circuit distinguished that behavior from "simple teasing, offhand comments, and isolated incidents" in finding in favor of the plaintiff. *Id*.

By way of contrast, in *Akers* the court held that, although the behavior in question might rise above "simple teasing" or "offhand comments," it did not meet the standard of egregiousness established by the *Morris* decision. *Akers*, 338 F.3d at 449. So too with this case. As in *Akers*, it is undisputed by the parties that, shortly after Dismukes complained about Jackson's treatment, he was removed from her supervisory authority. And as in *Akers*, the conduct in the present case does not meet the egregiousness standard required by Sixth Circuit precedent. Dismukes alleges that Jackson and, later, Mix "subjected [him] to criticism, scrutiny, ridicule, and/or verbal abuse, and otherwise treated [him] harshly." (Ex. 1 at 4.) Dismukes has also alleged incidents where Jackson belittled him in front of co-workers, such as by yanking a telephone from his ear and knocking papers from his desk. (Ex. 50 ¶ 30). But those incidents, though arguably rising above "simple teasing," appear to have been isolated. Neither Jackson nor any other of Dismukes' supervisors appears to have been acting out of anything but frustration at Dismukes' own job performance. Many of Dismukes' allegations, such as the allegation that Jackson and Mix criticized his work in front of others, are directly mirrored in the *Akers* decision. As in *Akers*, the conduct alleged in this case falls well short of the conduct

13

described in *Morris*.

Instead of an abusive or egregiously hostile working environment, the record paints a picture of a long-standing feud for which Dismukes was largely responsible. The record shows many instances in which Dismukes did not accept criticism and did not obey orders from his superiors at work. Glaringly, Dismukes does not dispute the defendants' allegations, supported by documentation, that he directly disobeyed his supervisors, but rather asserts that their directions were unfair. (Id. at ¶ 14.) Under *Akers*, the record as it exists cannot support a claim for Title VII retaliatory harassment.

## III. Claims Under Tennessee Statutes And Common Law

The defendants have raised sovereign immunity under the Eleventh Amendment as a defense to the plaintiff's claims under the Tennessee Human Rights Act, the Tennessee Public Protection Act, and for common law retaliatory discharge under Tennessee common law. Curiously, the plaintiff has not addressed the sovereign immunity defense.

The Eleventh Amendment forbids citizens from suing states in federal court, subject to a few exceptions. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States'") (quoting *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984) ("it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"). The exceptions to the general rule are: (1) where Congress has explicitly abrogated the states' immunity in a statute passed pursuant to Section 5 of the Fourteenth Amendment, (2)

14

where a state has explicitly consented to suit in federal court, and (3) in the narrow situation where a plaintiff is suing a state official to protect a constitutional right and is requesting prospective injunctive relief. *See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *Edelman v. Jordan*, 415 U.S. 651, 673-78 (1996); *Ex parte Young*, 209 U.S. 123, 155-57 (1908).

There is no serious question as to whether the defendants here are state agencies protected by Tennessee's sovereign immunity. The plaintiff has sued both defendants in their official capacities with the Tennessee Department of Children's Services. Because any award in this suit would ultimately be paid by the State of Tennessee, Tennessee's sovereign immunity protects the named defendants. *See Ritter v. Univ. of Mich.*, 851 F.2d 846, 848 (6th Cir. 1988); *Boyd v. Tenn. State Univ.*, 848 F. Supp. 111, 114 (M.D. Tenn. 1994). The only remaining issue is whether any of the three exceptions described above applies. The plaintiff has not argued in favor of any exception, and no cognizable argument can be made for them.

Aside from the Title VII claim, the plaintiff does not allege a federal cause of action arising from Section 5 of the Fourteenth Amendment. This court cannot circumvent Tennessee's sovereign immunity by asserting supplemental jurisdiction over the state claims. *Pennhurst*, 465 U.S. at 121 (1984). Therefore, the first exception does not apply. Although the plaintiff is arguably requesting prospective injunctive relief, along with other types of damages, *Ex parte Young* does not apply because the claims at issue do not involve constitutional rights; they were alleged under Tennessee statutes and common law. *Young*, 209 U.S. at 155-57.

Finally, we must address whether Tennessee has waived sovereign immunity under any of the state law claims. It has not. In order to waive sovereign immunity, a state must clearly articulate its intention to do so. *Edelman*, 415 U.S. at 673 ("[i]n deciding whether a State has

15

waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave not room for any other reasonable construction'") (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)). The THRA, Tenn. Code. Ann. § 4-21-101 *et seq*, (2005) and the TPPA, § 50-1-304 (2005), each contemplate suits against state officials in state courts, but not in federal courts. That does not constitute a waiver. *See Johns v. Supreme Court of Ohio*, 753 F.2d 524, 527 (6th Cir. 1985) ("[t]he fact that the state has waived immunity from suit in its own courts is not a waiver of Eleventh Amendment immunity in the federal courts"). Put simply, a state has the power to consent to suit solely in its own courts. Neither statute consents to suit in federal court.[4]

The plaintiff has pointed us toward no other Tennessee statute that would waive sovereign immunity over the state law claims. In fact, Tenn. Code Ann. § 20-23-102(a) clearly states that "No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property, and all such suits shall be dismissed as to the state or such officers, on motion, plea, or demurrer of the law officer of the state, or counsel employed for the state." In the absence of a statute specifically tailored to the causes of action in question that expressly contradicts that language, it is safe to say that Tennessee has not waived its Eleventh Amendment sovereign immunity in this case.

---

[4] In fact, with regard to the THRA, the plaintiff would have done well to consult *Boyd v. Tennessee State University*, 848 F. Supp. at 114, in which this court held, "There is no express consent by Tennessee, neither within the THRA nor elsewhere, to suit in federal court for claims under the THRA."

16

## CONCLUSION

For the reasons stated herein, the defendants' Motion for Summary Judgment will be granted. The plaintiff's Title VII claim will be dismissed for failing to establish a *prima facie* case, and its state law claims will be dismissed for violating the state of Tennessee's sovereign immunity under the Eleventh Amendment.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge